UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

                                        Case No. 23-cr-218-pp

     v.

DELANCE M. HOPE
and DOMINQUE M. HOPE,

                Defendants.

---

**ORDER DECLINING TO ADOPT REPORT AND RECOMMENDATION (DKT. NO. 61), REMANDING SUPPRESSION MOTION (DKT. NO. 54) TO JUDGE DRIES FOR FURTHER PROCEEDINGS, ORDERING PARTIES TO FILE JOINT STATEMENT WITH JUDGE DRIES AND DENYING WITHOUT PREJUDICE DEFENDANTS' REQUEST FOR LEAVE TO FILE <u>FRANKS</u> MOTION OUT OF TIME (DKT. NO. 70)**

---

## I.    Pre-Motion Procedural History

On November 28, 2023, the grand jury returned a four-count indictment against Delance and Dominique Hope, charging them with being prohibited persons in possession of firearms, knowing possession of a machinegun, knowing and intentionally possessing controlled substances and possession of a firearm in furtherance of a drug trafficking offense. Dkt. No. 1. Magistrate Judge Stephen C. Dries ordered the parties to file pretrial motions by January 2, 2024. Dkt. No. 4. Over the next six months, the defendants received multiple extensions of that deadline (Dkt. Nos. 8, 18, 20, 24, 30, 39, 42, 45, 48, and 50); the last deadline was July 3, 2024 (Dkt. No. 52). In one of those motions, filed April 17, 2024, defense counsel explained that one of the reasons for

1

seeking an extension of time was that "[c]ounsel began drafting proposed stipulated facts for counsel for the government and [counsel for Dominique Hope] to review to avoid the need for an evidentiary hearing." Dkt. No. 39 at 2, ¶5. Counsel listed the drafting of this stipulation in subsequent motions for extensions of time.

On July 1, 2024, the parties filed a document titled "Stipulated Facts," the opening paragraph of which stated that the parties agreed "to submission of the attached submitted recordings and stipulate to the following factual allegations for the purposes of pretrial motions." Dkt. No. 51 at 1. The document listed ninety-seven facts; it did not contain any information about how the parties planned to use the stipulation or how the court should use it. The defendants also filed a flash drive with the clerk's office that contained the exhibits referenced in the stipulation—body camera footage. Dkt. No. 53.

## II.    The Defendants' Motion to Suppress (Dkt. No. 54)

Two days later, on July 3, 2024, the defendants filed a motion to suppress evidence allegedly obtained in violation of the Fourth Amendment. Dkt. No. 54. In the opening paragraph, the defendants asserted that the police officers had entered and searched the upper unit at 2773 N. 54th Street without a warrant and with no applicable exception to the warrant requirement, finding evidence that they'd later used to obtain a warrant. Id. at 1. The defendants asserted that the "initial entry into and search of the residence violated the Fourth Amendment," and asked the court to "suppress the fruits of the illegal entry and search." Id.

2

The defendants stated the facts this way:

In the afternoon of July 24, 2023, Milwaukee police were seeking to arrest Delance Hope when they observed a vehicle registered to Shanice Dison, the mother of Hope's children. Doc. 51, at ¶1, 4. Ms. Dison's car was parked behind a garage adjacent to 2773 N. 54th Street. *Id.* at ¶2. Though the police had no information connecting either Hope or Ms. Dison's vehicle to that residence, the officers decided to check to see if Hope was inside the residence. *Id.* at ¶1-5, 12-20. According to law enforcement, Hope's state probation officer had issued an apprehension request for violating the conditions of his supervision. *Id.* at ¶9, 70.

Without any information linking Hope to the residence, a duplex, the police entered the duplex's front door and walked up the stairs to the upper unit. *Id.* at ¶1-5, 12-20. Once there, the police, armed with weapons drawn and protected with a shield, pounded on the wall and demanded that Delance Hope exit the home, threatening to break down the door if he did not. *Id.* at ¶35-37, 41, 46. After a few minutes, Hope exited the residence, and was placed in handcuffs. *Id.* at ¶47-50. As soon as he was handcuffed, Hope told officers they could not enter the home. *Id.* at ¶53-55. Despite that statement, and the fact that the officers lacked a warrant, the officers entered the home and began conducting what they called a protective sweep. *Id.* at ¶51, 56-67. All they had was a hunch.

Immediately upon entering, officers encountered Dominique Hope, Delance's brother, and Dominique's 13-year-old son. *Id.* at ¶56-57. With their firearms pointing directly at Dominique and his child, police disregarded Delance's protests to the officers' entry and ignored Dominique's demands to know what was happening. *Id.* at ¶56-66. Officers handcuffed Dominique and detained his son in the kitchen. *Id.* at ¶62. By 1:52pm, the officers had completed their "sweep" of the home, finding no other person or contraband. *Id.* at ¶78-79. Despite that, and the fact that they lacked a warrant or any other basis to be inside the residence, the officers began discussing a search for contraband. *Id.* at ¶79.

During Delance Hope's arrest, and well before the officers all entered the residence, Delance informed officers that he needed his glasses. *Id.* at ¶68. At 1:54 pm, after police had already acknowledged completing the sweep, one of the officers asked Dominique and his son if they knew where Delance's glasses were. *Id.* at ¶80. Dominique's son did, and went into the room to retrieve them, followed by Officer Domine. *Id.* at ¶81-83. As Dominique's son

3

grabbed the glasses, Domine began searching the bedroom. *Id.* at
¶85-86. Dominique's son asked if he could in the living room [sic]
and Domine denied the request, instructing the 13-year-old to sit
tight. *Id.* at ¶85. While doing so, he observed a small object on the
ground, which upon closer inspection he determined to be a "gun
light." *Id.* at ¶84-86. That observation was the basis for the search
warrant for the 54th Street residence.

Id. at 1-3.

The defendants argued that officers had entered 2773 N. 54th Street

without consent or a warrant, with no exception to the warrant requirement

and with no evidence linking Delance Hope to that residence. Id. at 2. The

defendants asserted that the officers searched for contraband and that one of

the officers found a "gun light;" they asserted that the officer's observation of

the "gun light" "was the basis for the search warrant for the 54th Street

residence." Id. at 3. The defendants concluded:

> Despite lacking any probable cause, a warrant, consent, or
> exigent circumstances, police unlawfully entered 2773 N. 54th
> Street, with their weapons drawn. . . . They then unlawfully searched
> his home. That entry violated the Fourth Amendment and the fruits
> of those violations must be suppressed.

Id. at 6-7. The motion did not mention the stipulation the parties had filed two

days earlier.

## III.    The Government's Opposition Materials (Dkt. Nos. 57, 57-1)

The government filed a brief in opposition to the motion. Dkt. No. 57.

According to the government, on July 19, 2023 an incident had occurred in

which a three-year-old child had shot herself with a gun "believed to have been

possessed by Delance Hope." Id. at 1. The government asserted that at the time

of that incident, Delance Hope was on supervision for a prior felony conviction.

4

Id. at 1-2. Although it is not clear from the government's brief, it appears that the shooting incident resulted in an investigation that included a search of Delance Hope's residence, recovery of two firearms and evidence that there had been a third firearm in the residence that was unaccounted for. Id. at 2. A suspect alert and a probation violation warrant were issued for Delance Hope, both of which were entered into the National Crime Information Center (NCIC) database. Id. This alert, and this warrant, caused officers to go to the North 54th Street residence on July 24, 2023. Id. at 1.

The government recounted that when they arrived at the 54th Street residence, officers had seen a car listed to the mother of the three-year-old shooting victim. Id. at 2. It explained how the officers entered the building, how they called for Delance Hope for four minutes and how one officer remarked that there was "lots of movement" in the upper residence. Id. The government stated that Delance Hope had opened the door and surrendered, had told the police that there was no one inside but then had told his brother (co-defendant Dominique Hope) to close the door. Id. The government explained that officers then entered the upper residence, detained Dominique Hope and Dominique's thirteen-year-old son and conducted a protective sweet of the entire residence, including the attic. Id. It described how, when one officer returned to the residence with Dominique Hope's son to try to find Delance Hope's glasses (at his request), that officer saw a gun light. Id. at 3. The government recounted that after Dominique Hope refused to consent to a search of the residence, the officer who'd observed the gun light obtained a state search warrant. Id.

5

Finally, it explained that execution of that state warrant resulted in the recovery of a safe containing three semi-automatic handguns (one of which was equipped with a machinegun conversion device) and a large bag of marijuana; two backpacks containing marijuana, cocaine, pills and scales; and a semi-automatic, rifle-style pistol with a forty-round-capacity magazine. Id.at 3-4.

In arguing that the officers had articulable facts warranting a reasonably prudent officer to believe that the residence harbored a person posing a danger to those on the scene, the government reiterated that on July 20, 2023, a notation had been made in the NCIC database that Delance Hope was "Armed and Dangerous" and wanted for two counts of being a prohibited person in possession of a firearm. Id. at 8. In a footnote, the government stated that the NCIC report "was provided to counsel for the defense with discovery materials." Id. at 8 n.1. The government argued that the protective sweep was reasonable in scope and duration, id. at 8-9, that the officer who observed the gun light was lawfully present, id. at 10, that the gun light was in plain view and that the incriminating nature of the light was immediately apparent, id. at 11-13, that the inevitable discovery doctrine applied, id. at 13-14, and that if the court concluded that the search was based on an invalid warrant, the good faith exception applied, id. at 15-16.

The government's response did not mention the stipulation between the parties. The government attached to its opposition brief the residential search warrant and the affidavit for the warrant. Dkt. No. 57-1. The affidavit was

6

signed by Officer Domine on July 24, 2023. Id. at 7. It averred the following

facts supporting probable cause:

> 3. Your affiant knows that on Wednesday, July 19th, 2023, at 5:52 PM, a call was generated for Milwaukee Police Officer to respond to 5157 N. 64th St., in the City and County of Milwaukee, WI, for a "shooting". According to the information transferred to officers through the Computer Aided Dispatch (CAD) number 232001271 is that a three year old child "shot herself in the hand" and "child found gun in closet."

> 4. Milwaukee Police Officers, including Squad 7278 (P.O. Michael BUDZISZEWSKI and P.O. Juwon MADLOCK), and Squad 7288 (P.O. Steven MENGE) responded to this residence. Shooting victim DLH (Redacted/19) was located outside the residence with a gunshot wound the right hand [sic], such that the right index finger was detached from the hand. P.O. MENGE reported he did observe DLH with [DLH's] mother Shanice B. DISON (b/f [DOB]) and KMM (Redacted/08) also outside of the residence. DLH made a statement to P.O. MADLOCK that she was playing with the gun and KMM made a statement to P.O. MENGE that the gun's in the closet in the back bedroom.

> 5. P.O. MENGE reported the closet in this northwest bedroom was open, and he discovered a "Glock" box unopened, what appeared to be a partially concealed black rifle on the floor on a pile of clothes, what appeared to be a partially concealed black and gray submachine style firearm with extended magazine outside of the firearm and loose cartridge next to the firearm, and a spent rifle casing on a pile of clothes, all in plain view. Of note, there was no firearm safe in plain view; the Glock box was moved, and there was no firearm inside. There was also a piece of mail listing to "Delance M. HOPE", with a different address listed from the residence 5157 N. 64th St.

> 6. DISON went to Froedtert Hospital, where Det. NARLOCK interviewed her. During the interview, DISON stated that she owned a Glock firearm, she owned a firearm safe, and there were no other firearms in the residence. DISON stated that her child's father, "Delance HOPE", (Delance M. HOPE, b/m, [DOB]) does not live there.

> 7. Det. BOHN conducted a records check, which revealed that Delance M. HOPE, b/m, [DOB], is on active parole regarding Court Cases 19CF5049, 19 CF1818, and 19CF4065. Det. BOHN contacted

the Wisconsin Department of Corrections, who informed affiant that HOPE's listed residence is indeed 5157 N. 64th St. Another records check revealed Delance M. HOPE is a convicted Felon in the cases 2008CF0005471, 2010CF000084, 2019CF001818, 2019CF004065, 2019CF005049, and that these remain of-record and are unreversed, prohibiting Delance HOPE from possessing a firearm; that Delance HOPE additionally is the defendant in 2022CF000681 and on bond in this case.

8.    Det. BOHN did complete an affidavit in support of a search warrant for the residence 5157 N. 64th St. Officers, including Detective Ebony STEELE searched the residence and recovered in addition to other evidence, an A.A. Arms AP9 9mm firearm and a American Tactical Omni Hybrid multi-cal 5.56 firearm.

9.    On Monday, July 24, 2023 at 1:38 pm officers of the Milwaukee Police Department, Special Investigation Division, Early Shift responded to 2733 N. 54th St. to conduct a check for HOPE after recognizing a vehicle described as a white Subaru legacy (vin # 4S3BWAE67L3015916) bearing WI auto AMV1436 parked in the rear of the location. The vehicle described has a department of transportation registered owner of Shanice Dison (b/f [DOB]), whom was identified as HOPES child's mother.

10.    Upon approaching the residence officers began knocking on the upper of the residence identified as 2773"a". Officers knocked for an extended period of time prior to HOPE emerging from the apartment access door. HOPE was taken into custody at the residence door. A subject identified as Dominique HOPE (b/f [DOB]) [sic] was in the residence with his 13-year-old son. Dominique was identified as Delances brother.

11.    The apartment was cleared for officer safety. During this time officers recognized a rail mounted laser / flashlight attachment for a firearm in plain view in the east bedroom area on the floor near the south east corner of the bedroom. Officers also recognized that the hatch the attic [sic] had been opened and was still ajar. Your affiant asked Dominique if the hatch was opened while officers were outside the residence. Dominique stated that it has always been missing the hatch, but when officers cleared the opened attic hatch for hiding occupants they observed the cover to be resting in the attic.

Id. at 4-5. The affidavit recounted that the same day, judicial Officer Maria Dorsey issued a warrant allowing officers to search the 2773 N. 54th Street resident. Id. at 1.

## IV. The Defendants' Reply Brief (Dkt. No. 60)

The defendants replied that the officers did not have a basis for conducting a protective sweep. Dkt. No. 60 at 1-7. They reiterated that the officers had no information linking Delance Hope to the residence on N. 54th Street: the officers weren't acting on a tip, they hadn't investigated the residence and they didn't know why Delance Hope was wanted for a violation of his supervised release. Id. at 5-6. The defendants then mentioned—for the first time in the briefing—the stipulation that the parties had filed a month earlier. They said,

> The government argues that officers had reason to believe firearms may be present in the residence because they thought Delance might have the Glock associated with the empty box they found in his home. But not only is it *not included in the parties' stipulated facts*, it's not included in any discovery the government produced.

Id. at 6 (emphasis added). (It is not clear what the "it" is to which the defendants refer; possibly they are referring to the empty gun box mentioned in that sentence.) Similarly, the defendants said:

> . . . the government argues that the police knew that Delance Hope was noted to be "armed and dangerous" in the NCIC law enforcement database . . . . Not only was this information not included in the stipulated facts, but more importantly, counsel received no evidence that the police officers had or knew this information prior to their entry at 2773 N. 54th Street.

Id. at 7.

9

The defendants went on to argue that even if the protective sweep had been lawful, the search exceeded the scope of its authority. Id. at 7-10. They argued that the officers who observed the gun light were not lawfully present in the home and that the incriminating nature of the gun light was not immediately apparent. Id. at 10-11. They asserted that the state search warrant was not valid and that the inevitable discovery doctrine did not apply. Id. at 12-13.

Finally, the defendants argued that the good faith exception did not apply because the officer who saw the gun light and applied for the warrant—Officer Domine—omitted material facts from the search warrant application and that those omissions misled the judicial officer who issued the warrant. Id. at 14. They asserted that the officers had gone to the 54th Street address on a hunch, that they did not know whether Delance Hope was there (or if they knew he was there, they did not know how long he'd been there) and that they did not see any items immediately identifiable as evidence of criminal activity (they said the officers saw the gun light after Delance Hope had been arrested and after the protective sweep was over). Id. at 14. The defendants asserted that Officer Domine was aware of these facts, "yet failed to include any of this information in the warrant." Id. The defendants maintained that "[w]ithout this information, the warrant would have been so facially lacking in probable cause that any reliance on it would have been unreasonable." Id. They argued that Officer Domine "knew that without [the allegedly omitted] information there were not enough facts to support the [judicial officer's] finding of probable

10

cause because it was the only reason offered as a basis to believe there were guns in the home." Id. (Presumably "it" refers to the gun light.)

As relief, the defendants again asked the court to suppress the fruits of the entry and search; they *did not* cite Franks v. Delaware, 438 U.S. 154 (1978), argue that they had made a preliminary showing under Franks or ask for an evidentiary hearing under Franks.

## V.    Judge Dries's Report and Recommendation (Dkt. No. 61)

On August 23, 2024, Magistrate Judge Stephen C. Dries issued a recommendation that the court deny the defendants' motion. Dkt. No. 61. Judge Dries began by recounting the information contained in the affidavit the officers had submitted to the state court in support of their request for a search warrant. Id. at 1. (The parties did not mention this affidavit in their July 1, 2024 stipulations of fact, nor did they file the affidavit as an exhibit to the stipulations. The government attached the affidavit to its brief in opposition to the suppression motion. Dkt. No. 57-1 at 3.) In the first sentence of the "Background" section of his recommendation, Judge Dries cited to the affidavit describing the July 19, 2023 shooting incident that appears to have triggered the chain of events that led to the challenged search. Dkt. No. 61 at 2 (citing Dkt. No. 57-1 at 4). For the next three pages or so, he cited only from the parties' July 1, 2024 stipulations of fact and from the body camera footage that the parties had filed along with those stipulations. Dkt. No. 61 at 2-5. In the last three paragraphs of the "Background" section, Judge Dries returned to citing the affidavit in support of the search warrant, recounting the

11

representations that Officer Domine had made in that affidavit and, in one instance, quoting from it. Id. at 5-6.

Turning to the legal arguments, Judge Dries first observed that although the defendants sought to suppress the fruits of what they argued were an initial entry and a search that violated the Fourth Amendment, the motion to suppress did not describe the "fruits" that the defendants wanted the court to suppress. Id. at 6. He explained that in their *reply* brief, the defendants had asked to suppress "all evidence obtained as a result of the police's unlawful activity in the home, including any weapons or narcotics found and any statements the [defendants] made." Id. at 6-7. But, Judge Dries recounted, law enforcement "did not seize any evidence during their initial entry into the residence;" he explained that law enforcement had seized the guns and drugs later in the day, during the execution of the state search warrant. Id. at 7. He reasoned, "Thus, information discovered during the initial entry is relevant only to the extent it prompted the police to obtain the warrant or was included in the warrant affidavit and was needed to establish probable cause." Id. (citations omitted). Judge Dries discussed the fact that the affidavit in support of the warrant contained only one paragraph about the initial entry; he recounted that Paragraph 11 averred that, "after Delance was taken into custody, the police cleared the residence for officer safety and noticed a gun light on a bedroom floor and that the attic hatch was wide open." Id. (citing Dkt. No. 57-1 at 5). He recounted that the paragraph also stated that "while Dominique

claimed the hatch had always been missing, the police observed the cover resting in the attic." Id.

After describing the law regarding protective sweeps, Judge Dries recounted that the defendants also had argued that the protective sweep exception did not apply because the police did not arrest Delance inside the residence, and that the defendants had cited United States v. Arch, 7 F.3d 1300, 1301-02 (7th Cir. 1993), in support of that argument. Id. at 9. Judge Dries emphasized that Arch involved a warrantless hotel room search for individuals who might be injured, and he explained that the Arch court had not decided whether there was a valid protective sweep because it had concluded that exigent circumstances justified the search. Id. He recounted that the Arch court had acknowledged that there were courts that had countenanced protective sweeps following arrests "just outside" the home on the theory that officers were as much at risk from "an unexpected assault on the defendant's doorstep as they might be inside the home." Id. (quoting Arch, 7 F.3d at 1303-04). Observing that officers arrested Delance Hope "in the open doorway of the residence on the second-floor landing of an interior stairwell,"[1] Judge Dries opined that "[t]he potential danger the police faced was at least as great as if the arrest had been made inside the residence." Id. (citations to cases omitted).

Judge Dries next addressed the defendants' argument that law enforcement had no articulable reason to believe that the 54th Street residence contained a dangerous person. Id. at 10. He recounted that the defendants had

---

[1] Judge Dries did not cite a source for this fact.

13

implied that the police went to that residence to look for Delance Hope, based on the probation warrant. Id. He said,

> According to the Hopes, the police had only a hunch that Delance was inside the upper unit of the duplex, and they didn't know anything about Delance's criminal history, who lived at the residence, or the residents' propensity for violence. The Hopes say the information the police had in our case pales in comparison to the information possessed in cases where the Seventh Circuit has found lawful protective sweeps.

Id. But, Judge Dries observed, the defendants had not cited "a single case" in which a court concluded that a protective sweep was unlawful. Id.

Judge Dries admitted that it was tempting to second-guess law enforcement—to ask why, if they believed there was someone in the home who posed a danger to them, they didn't just take the by-then-arrested Delance Hope and leave. Id. He declined to engage in such second-guessing because he found that "[t]he record contains specific and articulable facts that, at the time of the arrest, the police reasonably relied upon to conclude that a protective sweep of the residence was necessary to ensure their safety and the safety of others." Id. at 11. He recounted (without citation) that the police were looking for Delance when they arrived; he explained that although it was not clear whether the officers knew at that time what Delance was wanted for, Judge Dries's review of the bodycam footage (which the parties—the government and the defendants—had provided to the court along with the stipulated facts) revealed that several officers had mentioned the possibility of firearms. Id. (citing specific sections of bodycam footage). Judge Dries observed (without citation) that the officers had come prepared for possible violence—they had a

14

ballistic shield, several officers had their guns drawn and one officer "commented about their vulnerable position in the stairwell." Id. at 11-12. He explained (without citation) that the officers thought that Delance was inside the residence "because a car registered to the mother of his children was parked in the alley immediately in front of its garage (and the residence was not hers)." Id. at 12. He explained (without citation) that "[t]he police didn't appear to know who lived at the duplex, but they thought Delance was in the upper unit, as they knew the lower residents from a recent, unrelated investigation." Id.

Judge Dries continued, without citing to the record:

> The police knocked, announced, and asked Delance to exit because he had a warrant for his arrest. However, it took Delance nearly five minutes to open the door, indicating either severe reluctance to face the music or an effort to destroy or conceal evidence of criminal activity, and during that time the police claimed to hear a lot of movement inside the upper unit. When Delance finally exited the residence, he falsely said no one else was inside but then told someone inside ("Bro" or "Domo") to close the door. So, the police were looking for someone connected to a shooting who, when found, had delayed some five minutes and then lied about the presence of others in the house. When people lie to the police, the police must assume the lie is intended to cover up illegal activity, and so they might reasonably have concluded not just that other persons were present but that they were possibly dangerous. (People do not normally lie if it's merely their grandmother in the next room.) Not surprisingly, these factors put the police on edge, and they decided to make sure the scene was clear before they withdrew with Delance.

Id. (case citations omitted).

Judge Dries then addressed the defendants' argument that even if the protective sweep was lawful, the police exceeded the scope of a lawful protective sweep. Id. at 13. He recounted that the defendants had accused the police of

15

staying at the residence well after they had completed the sweep and of illegally detaining Dominique Hope and his son. Id. He observed that the defendants also had accused police of "searching the attic after confirming that it was free of people[2] and that the police were not lawfully present when Officer Domine observed the gun light." Id. In response to this argument, Judge Dries walked through the nine minutes of body camera footage recorded between the time of Delance Hope's arrest and the end of the sweep. Id. Judge Dries said,

> Although nine minutes may seem like a long time for a cursory inspection, the body cam videos show that the police methodically moved room to room through an unfamiliar home that had several closed doors and many potential hiding places. The police reasonably detained Dominique and his son while performing the sweep. The police also reasonably remained in the residence after the sweep because by then they had probable cause to believe it contained contraband given the lengthy delay in Delance exiting the residence, the sound of movement inside the residence during those four-and-a-half minutes, the displaced attic hatch, and Dominique's incredible explanation that the hatch was always missing (which proved false when the police inspected the attic with the camera).

Id.

Judge Dries went on to recount that Officer Domine saw the gun light about two minutes after the police completed the protective sweep. Id. at 14 (citing to the stipulated facts). Citing the body camera footage, Judge Dries recounted that "[b]efore Officer Domine told his colleagues what he'd seen, another officer asked Dominique [Hope] for consent to search the residence."

---

[2] The defendants' motion to suppress does not mention the attic. Dkt. No. 54. In their *reply* brief—which was twice the length of their motion—the defendants asserted that after Delance Hope had been arrested, officers who stayed in the residence "did obtain a chair and search the attic." Dkt. No. 60 at 8 (citing the stipulations of fact (Dkt. No. 51 at ¶79) and a segment of the body cam footage).

16

Id. Judge Dries explained that Dominique had refused to give consent, so the officers had "reasonably secured the scene while they sought a search warrant." Id. Again citing the body camera footage, Judge Dries explained that Delance Hope was still on site at this time, and that he "repeatedly asked for his glasses, claiming that he couldn't see without them." Id. He explained that although Delance suggested that Dominique could retrieve the glasses, "Dominique's son voluntarily walked into the bedroom to look for them." Id. (citing body camera footage). Judge Dries said, "Given that the police had swept the residence only for people, and therefore still had concerns for their safety and about the potential destruction of evidence, Officer Domine reasonably followed the son into the bedroom where the gun light was lying in plain view on the floor near the glasses." Id. Judge Dries explained that Domine didn't move the light, and he opined that "using his phone's flashlight to illuminate the floor did not render Officer Domine's actions impermissible." Id. (citations omitted). Observing that the Fourth Amendment prohibits *un*reasonable searches, Judge Dries found it "entirely reasonable" for law enforcement to go into the bedroom to help find Delance's glasses before taking him in for booking. Id. at 14-15. In a footnote, he said, "The government says the police observed the gun light in plain view while lawfully present inside the bedroom. I agree. However, because they did not seize the light at that time, the plain view doctrine doesn't appear to apply." Id. at n.5.

On the other hand, Judge Dries said:

. . . [I]t appears from reviewing the body cam videos that the police were looking for more than just people. At the outset of the sweep,

Officer Domine remarked to another officer, "They said there's a gun somewhere?" Domine body cam, at 13:44:08-13:44:12. He then opened a kitchen cabinet that even the world's most inflexible contortionist couldn't' fit in. *See id.* at 13:44:12-13:44:40. Later, after confirming that the open attic was clear of people, the officer operating the tablet suggested getting a chair to check to see if anything else was hidden up there, and the other officer continued to poke around with the camera. *See* Axon_Body_3_Video_2023-07-24_1344_X60AC2978, at 13:51:15-13:53:25. These actions exceeded the permissible scope of a protective sweep. *Cf. Contreras*, 820 F.3d at 269 (finding a protective sweep permissible in scope where the police "did not search any drawers, containers, or other places for evidence, but merely looked for people so that they could ensure officer safety"). However, as noted below, none of these actions uncovered the evidence that underlay the application for the search warrant.

Id. at 15.

Judge Dries then considered the parties' arguments regarding inevitable discovery and the independent source doctrine. He explained that although the government had relied on the inevitable discovery exception to the exclusionary rule, he believed that the independent source doctrine—a doctrine often confused with the inevitable discovery doctrine—was the "better fit" because the government actually had obtained a search warrant. Id. at n.6. He agreed with the government that the evidence that formed the basis for the indictment—"(i.e., the guns and drugs)"—had been seized pursuant to a search warrant. Id. at 15. He reiterated that the search warrant affidavit did not rely on any illegally-obtained information:

The observation of the missing attic hatch (and Dominique's explanation for why it was missing) occurred during a lawful protective sweep. Although the police exceeded the scope of that sweep in some respects, the warrant affidavit did not include any information from that transgression. *See United States v. Smith*, 108 F. App'x 402, 405 (7th Cir. 2004) (affirming the denial of a motion to suppress where the only item the police noticed during an allegedly

18

unlawful protective sweep was not mentioned in the search warrant affidavit). The open attic, combined with how long it took Delance to exit the residence and the movement heard inside, did appear to motivate the police to seek the search warrant (after Dominique denied consent) and was crucial to the probable-cause finding. Neverthess, those findings do not affect the validity of the warrant search, as the attic hatch observation rests on strong legal footing.

Similarly, the police did not violate the Fourth Amendment when they observed the gun light. Officer Domine reasonably accompanied Dominique's son into the bedroom to look for the glasses that Delance said he needed in order to see. Also, the body cam videos show that Officer Domine's observation did not prompt the police to seek the search warrant. Before Officer Domine told his fellow officers what he'd seen, another officer asked Dominique for permission to search the residence and said they'd apply for a warrant after Dominique refused. *See* Domine body cam, at 13:54:24-13:56:30. The police therefore decided to apply for a search warrant before they even know about the gun light.

Id. at 16-17.

Judge Dries also opined that even if the police had violated the Fourth Amendment when they went into the bedroom to look for Delance's glasses, "the search warrant affidavit contained sufficient facts to establish probable cause apart from the reference to the gun light." Id. at 17. He explained that the affidavit "contained only once sentence about the gun light," and that the rest of the affidavit focused on the investigation into "the shooting incident involving Delance's young daughter and the events at the 54th Street residence." Id. He recounted that the affidavit explained that the little girl had shot herself playing with a gun found in a bedroom closet, and that in that closet, the police had found an empty case for a Glock pistol, as well as a rifle, a submachine gun with an extended magazine and ammunition. Id. at 18. He said that the affidavit also had reported that the police found in the closet a

19

piece of mail belonging to Delance Hope, "suggesting that the firearms belonged to him." Id. Judge Dries recounted that the affidavit said that Ms. Dison (the child's mother) had said she owned the Glock and a gun safe (no gun safe was found) and had said there were no other guns in the house, and the affidavit recounted that Delance Hope had prior convictions and was on extended supervision, so was prohibited from having guns. Id.

Judge Dries summed up:

> The affidavit suggested that the police were looking for Delance and, four days after the shooting incident, they zeroed in on a duplex located on North 54th Street. *See* Ex. A, at 5. The affidavit indicated that the police located Dison's vehicle parked outside the back of that residence. The affidavit further indicated that the police approached the residence to conduct a check for Delance and that they knocked on the upper unit of the residence for an extended period of time before he exited. The affidavit stated that two other individuals were present: Delance's brother, Dominique, and Dominique's teenage son. The affidavit noted that, while clearing the residence for officer safety, the police saw that the attic hatch had been open and was still ajar. Finally, the affidavit noted that Dominique's explanation—that the hatch had always been missing—didn't jibe with the hatch cover the officers saw resting inside the attic. Together, those facts established a fair probability that the residence contained an illegal firearm or other contraband. The issuing judge therefore had probable cause to issue the warrant even absent the solitary sentence about the gun light.

Id.

**VI. Post-Recommendation Litigation**

Judge Dries issued the recommendation on August 23, 2024; he advised the parties that written objections were due within fourteen days (that is, by September 6). Id. at 19. The defendants sought multiple extensions of the deadline to file their objections and reply (Dkt. Nos. 63, 65, 67). The first

20

motion simply stated that both the defense and the government needed more time given other matters. Dkt. No. 63.

In the second motion, defense counsel explained that defense counsel had been discussing with the government issues that the defendants "intended to raise in their objections," and that one of those issues "prompted undersigned counsel to request additional discovery from the government." Dkt. No. 65 at 1. Defense counsel asserted that Judge Dries had relied on information outside of the record "related to a July 19, 2023, incident" and information that the government had not produced in discovery. Id. at 2. The specific information upon which Judge Dries had relied, defense counsel explained, was Officer Domine's search warrant affidavit, which defense counsel said Domine had drafted "about an investigation and search that he was not personally involved in and that occurred at a different address about a week prior to the challenged search in the instance [sic] offense." Id. Defense counsel asserted that Judge Dries had relied on the warrant affidavit to draw inferences, then had relied on those inferences to come to his conclusions. Id. Defense counsel stated that the defendants "did not receive any discovery related to the July 19, 2023, incident except for the warrant," and asserted that the affidavit did not say what Judge Dries said it said. Id. Defense counsel reiterated that in their reply, they had "asked the Magistrate Judge not to consider the government's inferences and arguments which were supported by factual allegations outside the record and stipulated facts." Id. They asserted that Judge Dries nonetheless relied on allegations from the warrant affidavit to

21

make findings, and that he adopted inferences and arguments from the government based on the contents of the affidavit. Id. at 3. Defense counsel said that they had "not been able to confirm" that the account of the events in the affidavit was "an accurate account of the investigation." Id. The defendants explained that they had asked the government for discovery related to the July 19, 2023 investigation, but that the government had responded that it did not have reports relating to that investigation and asked defense counsel to send the government an email outlining the defendants' specific discovery requests; the government said it would provide information it deemed relevant. Id.

Based on these representations, the court granted an extension of the objection deadline to October 28, 2024. Dkt. No. 66. The day before that deadline expired—October 27, 2024—defense counsel filed another request for an extension of time. Dkt. No. 67. They explained that on October 17, 2024, the government had produced the discovery the defendants had requested; they said that while defendant Delance Hope's counsel had begun reviewing the discovery, her other obligations had prevented her from completing that review until the weekend prior. Id. at 2. Counsel also explained that she'd not been able to discuss the discovery with co-counsel, or to obtain the government's consent to an extension of the objection deadline. Id. The court extended the deadline to October 31, 2024. Dkt. No. 68.

On November 1, 2024, the defendants filed a motion for leave to file their objections instanter. Dkt. No. 69. Defense counsel stated that defendant Delance Hope's counsel had not finished reviewing the discovery until October

22

26, 2024, and that because of other work obligations, she'd not been able to complete a draft to share with co-counsel until the early morning hours of November 1, 2024. Id. at 1-2. The court granted the request for leave to file *instanter*, dkt. no 71, and the defendants filed their objections on November 1, 2024, dkt. no. 70.

## VII. The Defendants' Objections/Government's Response/Defendants' Reply (Dkt. Nos. 70, 75, 82)

### A. The Defendants' Objections (Dkt. No. 70)

The defendants first recite the following facts:

> Milwaukee police officers saw Delance Hope's girlfriend's car behind a garage adjacent to 2XXX N. 54th Street, Milwaukee, WI. Doc. 51 at ¶ 1-4. The car was registered to 4XXX W. Lisbon Ave, Milwaukee, WI. *Id.* at ¶ 4. There was a "subject alert" for Delance who was wanted for a probation violation. *Id.* at ¶ 8-9. Aside from Delance Hope's girlfriend's car being parked in the garage adjacent to 2XXX N. 54th Street, officers didn't have any reason to believe that Delance was there, and if he was there, no reason to know how long he had been there, how he was connected to the residence, or how he knew the residents. *Id.* at ¶ 12-21. Police didn't make any effort to investigate the residence at 2XXX N. 54th Street, its residents, Delance Hope's "subject alert" or alleged probation violations, or seek an arrest or search warrant. *Id.* at ¶ 5-9, 12-20.

Dkt. No. 70 at 2. The defendants' introduction emphasized Judge Dries's comments that the police were "looking for more than just people" and that they'd opened a cabinet "that even the most flexible contortionist couldn't fit in." Id. at 2-3 (citing Dkt. No. 61 at 1-2). They reiterated that after completing the protective sweep, officers had stayed on the premises, searched the interior and interrogated the occupants. Id. at 2.

It appears that the defendants are not clear about whether Judge Dries concluded that the officers' entry into the N. 54th Street residence was a justifiable protective sweep; they argue that "[i]f the Report and Recommendation's conclusion is that the officers' entry was justified by the protective sweep," they object to that finding. Id. at 4. They argue that the officers "entered the 54th Street address without conducting any surveillance or investigation into Delance or the residence, let alone make any effort to seek an arrest warrant or a search warrant." Id. The defendants assert that this lack of intelligence or surveillance meant that the officers did not have specific and articulable facts reasonably justifying a belief that the residence "harbored an individual who posed a danger to the police." Id. The defendants then argue that even assuming the officers had justification to come into the residence and conduct a protective sweep, once in, they did more than conduct a "cursory search for people who might pose a danger to them." Id. at 4-5. They reiterate Judge Dries's comment that officers opened a cabinet that not even a contortionist could fit inside. Id. at 5.

In terms of the "specific and articulable suspicion" requirement for a protective sweep, the defendants assert:

> Delance Hope had a VOP hold for allegedly violating the terms of his state supervision. Doc. 51 at ¶ 9. When police arrived at the N. 54th Street address, they were unaware of the nature of Delance's supervision violations. Id. They also had no more than a hunch that he might be at the N. 54th Street address based on the observation of his girlfriend's car parked in front of a garage that was adjacent to the N. 54th Street address. Id. at ¶¶ 2-3, 5, 12-18. The police also didn't have any information about the N. 54th Street address, who lived there, or what Delance's connection might be to them if he was there. Id. at ¶ 10-18. They were aware that the home was a duplex

24

and decided to look for Delance in the upstairs unit given a recent investigation in the downstairs unit that led them to believe he wouldn't be there. *Id.* at 10, 21.

Id. at 5-6. They argue that the government has provided no explanation for why law enforcement didn't investigate or surveil the residence or its occupants, reiterating that the officers "were acting on no more than a hunch" when they appeared at the residence. Id. at 6. The defendants take issue with Judge Dries's refusal to use hindsight to "second-guess" the officers' decision to enter the home; the defendants assert that "evaluating the officers' decisions from a judicial chambers is precisely what the Court must do." Id. at 8. They insist that the officers had no specific or articulable facts supporting a belief that they were entering a residence that contained a person dangerous to them. Id. That lack of information, the defendants repeatedly assert, means the officers went to the N. 54th Street residence on nothing more than a hunch. Id. at 9.

The defendants next argue that Judge Dries relied on "speculative inferences" in reaching his conclusions. Id. at 9. They argue that although Judge Dries said that "several" body camera videos mentioned the possibility of a firearm, none of the exhibits he cited "provides any mention of belief or basis for a belief that Delance would be armed, but rather the officers' hunch that there may be contraband in the house—the reason they didn't want to leave even though they lacked any permissible basis to remain in the home." Id. at 9-10. They argued that Judge Dries relied on the fact that the officers had a ballistic shield to "conclude that they came prepared for violence." Id. at 10. The defendants speculate that "it may be standard for police to use a ballistic

25

shield when conducting a wanted check, and not a decision based on a specific fear connected to Delance or the 54th St. address." Id. They assert that the presence of a ballistic shield sheds no light on why the officers brought it. Id. The defendants say that Judge Dries speculated about why it took Delance Hope so long to come to the door, opining that perhaps he was reluctant to "face the music" or was destroying or concealing evidence. Id. The defendants assert that the evidence supports neither speculation; they maintain that the police were there for a wanted check, not to investigate a crime, and that there was no evidence that Delance was trying to destroy or conceal evidence. Id. They maintain that "a finding that Delance was reluctant to be arrested for a probation violation doesn't help the Court's inquiry about whether the officers had a reasonable fear that warranted an entry into the home and a protective sweep." Id. at 10-11.

The defendants say that Judge Dries stated that the police were looking for "someone connected to a shooting," but they argue that the evidence does not support that. Id. at 11. The defendants maintain that when the police approached the residence, all they knew was that Delance Hope was wanted for supervision violations; they say that "[t]he details of the July 19, 2023 investigation involving a shooting were not learned until after the protective sweep and unlawful search and interrogation." Id. at 11. They object to Judge Dries's conclusion that Delance Hope "lied" to police about whether here was anyone else in the house. Id. They assert that

> [t]he Report and Recommendation interpretation of the statement
> fails to consider the context under which it was made. Delance was

26

objecting to police entering the home, telling police they had no right to go into the house because they didn't have a warrant. *See* subj_wanted_cad_232050856_IR232050119_Benitez_Miguel_A, at Time Stamp 13:42:48. Delance then immediately shouted into the house and stated, "close the door, bro, close that door, they want me." *Id.* So it's unreasonable to conclude that Delance was actually lying to police and trying to hide someone else's presence in order to "cover up illegal activity." Doc. 61 at 12.

Id.

Next, the defendants argue that the officers exceeded the scope of a protective sweep. Id. at 12. They quote—again—Judge Dries's statement that the body camera footage shows that the police were searching for more than people. Id. They recount that from the moment of entry, officers looked "in kitchen cabinets, between radiators and walls, in the attic after confirming no people were present, and between couch cushions." Id. The defendants assert that Judge Dries did not reconcile these facts with a finding that the officers did not include unlawfully obtained information in the warrant affidavit. Id. They stated that "[b]y 1:51 p.m., Delance had been arrested and the officers had completed their protective sweep;" they assert that at that point, any concerns about the residence harboring a dangerous individual had been put to rest and there no longer was a justification for the officers to be in the home. Id. at 12-13. They argue that "not a single officer left the home, or even started to leave the home as required by law," and that the officers stayed in the house to continue the search. Id. at 13.

The defendants also recount that once the protective sweep was complete, the police kept Dominique Hope and his son under their custody and control and interrogated them. Id. They maintain that shortly after the

27

interrogation, "Officer Domine searched a bedroom that had already been cleared during the protective sweep." Id. at 14. And they say that Domine "then returned to the living room and informed other officers that he found a gun light mount in the bedroom." Id. The defendants assert that the warrant affidavit recounted that the officers had learned that Dominique lived in the residence with his teenage son and that police had seen a gun light; they say that the affidavit also contained "*some* of Dominique's statement about the open attic hatch." Id. But, the defendants maintain, the officers obtained that information after the protective sweep had been completed, when officers had no legal justification to be in the home or to question its occupants. Id.

Next the defendants argue that if the court agrees that the protective sweep was unlawful or that the officers exceeded the scope of a protective sweep, "inevitable discovery (independent doctrine) does not cure the violation." Id. They argue that under the inevitable discovery exception, evidence obtained from an unlawful search still may be admissible if it ultimately or inevitably would have been discovered lawfully. Id. at 14-15 (citing Nix v. Williams, 467 U.S. 431, 432 (1984)). They emphasize that the question is not whether the evidence could have been discovered by lawful means, but whether it would have been. Id. (citation omitted). The defendants maintain that the government has not provided any evidence "showing that the officers would have sought a warrant if they hadn't illegally searched and interrogated Dominique *after* the conclusion of their protective sweep." Id. at 16. They assert that without the allegedly illegal search and interrogation of Dominique Hope, there was no

28

probable cause to obtain a warrant and no nexus to the July 19, 2023 investigation. Id.

The defendants contend that if the officers had sought a warrant "without the illegally obtained evidence," they would have had only the following facts:

- That Delance Hope was wanted for a suspect alert and violation of supervision conditions;

- That officers saw Delance Hope's girlfriend's car parked in front of a garage adjacent to the N. 54th St. residence;

- That the officers conducted a "check" for Delance Hope at that residence;

- That the officers knocked on the upstairs unit because they did not think Delance Hope was downstairs;

- That a male voice responded to the knock; and

- That Delance Hope took approximately four and a half minutes to come out of the residence and surrender to police.

Id. at 17.

The defendants argue that police supported this information with Dominique's explanation that the attic hatch always had been missing—an explanation the defendants argue he made "while he was in custody in his own home, where officers remained despite their sweep being com[l]eted." Id. at 18. And they point out that when Dominique said the attic hatch had "always" been missing, the body camera footage shows that by "always," he meant the

two months he'd lived there. Id. at 18-19. The defendants assert that by excluding that information, "the officers encourage misinterpretation of the facts." Id. at 19. They say that Dominique's explanation "is much more reasonable, and credible, when considering that he had just moved into the unit and just hadn't gotten to addressing it with a 'piece of ply board.'" Id. (citing body camera footage). The defendants allege that Officer Domine "chose to omit that fact from his warrant affidavit." Id. They say that

> [w]ithout the illegally obtained information, all officers had was Delance's four-minute delay in his surrender to police outside the apartment, the movement they heard in the home during the wait, and an open attic hatch. Accordingly, the government cannot prove that the officer's request for a warrant was *not* prompted by their illegally obtained information: the police not only failed to seek a warrant before unlawfully entering and remaining in the home to search and interrogate Dominique, they also failed to provide a warrant affidavit that was not supported by illegally obtained evidence.

Id.

The defendants concede that, based on the way Officer Domine's warrant was written, Judge Dries's conclusion that the officers' observation of the missing attic hatch and Dominique's explanation for why it was missing happened during a lawful protective sweep. Id. at 20. They point to Domine's statement that the apartment was cleared for officer safety, and that "[d]uring this time" officers saw the hatch and questioned Dominique about it. Id. They maintain, however, that the body camera footage shows that after the sweep had concluded, the officers "let Dominique go into his living room and began to question him—albeit while still handcuffed." Id.

The defendants contend that although Judge Dries found that the officers did not violate the Fourth Amendment when they observed the gun light, he stated no legal justification for Officer Domine being in the room where the gun light was found. Id. They maintain that Domine was not in the room conducting a protective sweep, because that sweep already had been completed, and therefore that there was no legal justification for him to be in the room. Id. at 20-21.

The defendants take issue with Judge Dries's implication that Officer Domine had consent to be in the room where he saw the gun light because he was there looking for Delance's glasses, which he had requested. Id. at 21. They argue that Delance's request for his glasses, and comment that he couldn't see anything, "cannot reasonably be interpreted as implied consent." Id. They maintain that Delance was asking the officers to let him return to the house and get his glasses, not asking the officers to get the glasses; they also argue that Dominique did not give his consent. Id. In a footnote, the defendants assert that Judge Dries erred in finding that Domine saw the gun light lying in plain view with the glasses; they cite body camera footage showing that Dominique's son found the glasses and gave them to Domine, after which Domine "returned to the area where the minor found the glasses and searched the area with his flashlight." Id. (citing Axon_Body_3_Video_2023-07-24_1339_X60AC232A, at 13:54:55-13:55:28).

The defendants also disagree with Judge Dries's conclusion that although the officers exceeded the scope of a protective sweep, they did not

31

uncover any evidence that supported the search warrant affidavit. Id. at 21. The defendants emphasize that two of the three paragraphs describing the N. 54th Street incident recount Domine's observation of the gun light, Dominique's explanation about the attic hatch and Dominique's statements that he lived at the residence and was Delance's brother. Id. at 21-22. The defendants argue that the only fact in the affidavit that the officers knew before the allegedly unlawful search was that it took Delance some four minutes to respond and that the officers saw the attic hatch open when they came in. Id. at 22. The defendants maintain—without providing detail—that "[e]ven coupled with the investigation at Delance Hope's girlfriend's house, there was no nexus or factual support for officers' belief that guns would be found in that residence when all they had was Delance taking four minutes to surrender and an open attic door." Id. The defendants allege that Domine did not know whether Delance was in the residence, how long he'd been there, what his connection was to the residence or who the occupants of the residence were until they "unlawfully questioned Dominique;" they alleged that Domine knew about these informational deficiencies when he drafted the warrant affidavit but that he "intentionally excluded" those deficiencies "because the information further diminished the already non-existent nexus between the July 19, 2023, investigation detailed in the warrant affidavit and the arrest that took place [at the] N. 54th Street Address." Id. at 22-23.

The defendants reiterate that the protective sweep was over when Domine went into the bedroom and observed the gun light, and they maintain

32

that because they had no information about the criminal history of the occupant, the gun light "was not immediately and apparently incriminating in nature." Id. at 24. They reiterate that the officers' interrogation of Dominique violated the Fourth Amendment because the protective sweep had concluded, the officers nonetheless stayed in the home, they kept Dominique and his son in custody without legal justification and they interrogated Dominique without first giving him his Miranda warnings. Id. at 24-25.

As to the defendants' argument that Domine deliberately left information out of the search warrant affidavit, the defendants ask the court to suppress "evidence obtained as a result of a warrant that relied on unlawfully obtained evidence," but they say that they "will move to file an additional motion seeking a *Franks* hearing related to the misleading and false information used to obtain the search warrant in light of the recently produced evidence." Id. at 25-26. They ask that if the court relies on the warrant affidavit in its decision, that it grant them leave to file that motion "in light of the recently produced evidence that appear[s] to show the affidavit included misleading and misrepresented factual allegations related to the July 19, 2024 investigation." Id. at 26.

The defendants do not explain the nature of the evidence the government produced in mid-October 2024. But they object to this court "relying on or adopting facts outside of the record because the parties did not stipulate to those factual allegations, and the defendants were neither provided with the discovery during the normal course of production nor afforded an evidentiary hearing to dispute the allegations." Id. at 26. They say that if the court does

33

decide to reply on the "information" to make its decision, the court should not

reply on or adopt five of Judge Dries's findings of fact. Id. at 27.

B.    The Government's Response (Dkt. No. 75)

The government asks the court to adopt Judge Dries's recommendation

and deny the defendants' motion entirely. Dkt. No. 75 at 1. It began with a

"supplemental factual proffer." Id. at 2. That proffer states:

> Prior to the filing of the Defendants' initial Motion to Suppress, undersigned counsel conferred with counsel for Delance Hope, Attorney Gabriela Leija, and counsel for Dominique Hope, Attorney Thomas Erickson, regarding a stipulation of facts, resulting in the parties' jointly filing the same (ECF 51). The Government proffers the following facts to supplement that document, which are supported by the materials produced to the defendants in discovery.

> On July 20, 2024, Officer Brandon Rutherford applied for and obtained a search warrant from the Milwaukee County Circuit Court pertaining to cell phone data for a number he believed to belong to Delance Hope. That affidavit detailed facts related to the July 19th, 2023, shooting investigation and is attached herein as Exhibit A.

> The Government submits this Supplemental Proffer in light of issues raised in Defendant's reply (ECF 60), Judge Dries' Report and Recommendation (ECF 61), and the Defendants Objections (ECF 70). Specifically, Defendants argue in their Objection that officers on scene were unaware of the July 19th shooting investigation prior to their protective sweep of the 54th Street Residence. (ECF 70 at 10). The Supplemental Proffer bears directly on this fact. The information contained in the Supplemental Proffer, above, was in discovery provided to defendants.[3]

> Undersigned counsel for the government conferred with counsel for the Defendants regarding this supplemental information and the potential for stipulation to this fact. Defendants advised that they object to the government relying on evidence that was not

[3] The government added a footnote here that reads, "Bates stamped 'STATE SEARCH WARRANTS 000015-000038", disclosed May 2024." Dkt. No. 75 at 2 n.1.

34

included in the parties' previously agreed-upon facts (ECF 51. Defendants advised their position is that at the current stage of litigation, the Government should not seek to introduce evidence outside the stipulated facts.

The Government would nevertheless ask the court to consider the proffered facts when conducting its *de novo* review of Judge Dries' decision. *See* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). At the time the Government and counsel for Defendants initially conferred regarding the stipulation of facts prior the filing of Defendants' initial Motion to Suppress, the Government advised counsel that additions to those facts may be appropriate depending on the arguments raised by Defendants during litigation.

Thus, because the supplemental proffer bears directly on the issue of officers' prior knowledge of the July 19th 2023 shooting investigation, the Government respectfully requests this Court consider the Supplemental Proffer as part of the factual record for this case. The Government believes the Supplemental Proffer is necessary for a full understanding of the officers' knowledge of the prior shooting investigation prior to their decision to conduct a protective sweep and refutes assertions in the Defendants' Objections that "[p[olice] were there on a 'wanted check,' not to investigate a crime", that "all police officers knew when they approached (and entered the home) to check if Delance was there, was that he was wanted for supervision violations" and that "[t]he details of the July 19, 2023 investigation involving a shooting were not learned util after the protective sweep and unlawful search and interrogation." ECF 70 at 10-11.

Id. at 2-3.

The government responds to the defendants' objections by asserting that when officers arrived at the N. 54th Street residence, they were there to arrest Delance Hope, "who was wanted in connection with a shooting and for being a felon in possession of a firearm." Id. at 5. It says that the officers saw Ms. Dison's car outside the N. 54th Street residence, "which provided an indication that Hope was in fact there." Id. at 6. They asserted that when the officers

knocked and announced their purpose, asking Delance to come out, Delance "significantly delayed answering the door despite repeated and loud warnings by law enforcement." Id. The government recounts that (per the parties' stipulation), during the four-and-a-half-minute wait for Delance to come to the door, one of the officers "remarked twice that he heard 'lots of movement' in the upper residence." Id. And, the government says, when he answered the door, Delance "falsely told officers 'ain't nobody in there,'" before telling his brother, "(who was, in fact, in there) to close the door to the residence." Id.

The government argues that Judge Dries's speculations about why the officers brought a ballistic shield were reasonable; it says that it is the defendants who speculate, without evidence, that the police may have brought the ballistic shield as standard procedure. Id. In response to the defendants' argument that all the officers knew when they arrived on scene was that Delance Hope was wanted for violations of conditions of supervision, the government states that "Officer Rutherford, who was with the investigation team on scene, drafted a warrant for cell phone data on July 20th, 2023, summarizing the facts of the underlying shooting case." Id. at 7 (citing the Rutherford affidavit at Dkt. No. 75-1).[4] The government says that Rutherford's affidavit shows that "investigators on scene had prior knowledge that Delance

---

[4] The parties' stipulated facts confirm that Rutherford was one of the officers who participated in the events at N. 54th Street on June 24, 2023. Dkt. No. 15 at ¶¶23, 25, 26, 27, 29, 30, 35, 37, 40-43, 45-46, 49-50, 70, 97. In fact, the parties agree that Rutherford was the officer who repeatedly knocked on the door and demanded that Delance Hope come out and was the officer who took Delance into custody.

36

Hope was wanted in connection to that shooting incident and for being a felon in possession of a firearm." Id.

The government also says that when Delance Hope opened the door after the four-and-a-half-minute delay, he "immediately" lied about there being anyone else in the home, "(a lie that was clearly disproven by their immediate observation of Dominque and his son)." Id. The government gives no citation for its statements that the officers immediately observed Dominique and his son, but it argues that "[h]aving once been lied to, officers had reasonable suspicion that Delance was concealing persons in the residence." Id. The government argues that Delance's "open warrant for firearm possession, extended delay in answering the door, the sounds of movement inside the residence, and his immediate lie to officers about other occupants were specific, articulable facts which . . . justified a protective sweep." Id. at 8.

The government argues that the officers did not exceed the scope of the justified protective sweep. The government views the body camera footage as "consistent with a genuine fear that they may be dealing with an armed suspect." Id. at 10. It emphasizes that one of the officers—Officer Benitez—had his shield raised in front of himself and fellow officers from before the officers even knocked until after the mean floor had been cleared (but before the attic had been cleared). Id. The government quotes Judge Dries's statements about the body camera footage showing the officers moving methodically through the unfamiliar space. Id. at 10-11. The government disagrees with Judge Dries's perception that the officers were looking for more than just people; it interprets

37

Officer Domine having asked a fellow officer "they say there's a gun somewhere?" as an expression of concern for the officers' safety, not an expression of intent to search for contraband. Id. at 11. And as for the kitchen cabinet that Judge Dries described as one that a contortionist could not fit it, the government argues that Domine could not tell from the *outside* of the cabinet that it would not fit a person; it was only after he briefly opened the door and saw shelving inside that he'd have known that a human could not have fit in the cabinet. Id. at 11-13.

The government maintains that Domine was lawfully present in the bedroom where he observed the gun light. Id. at 13. It recounts that the initial sweep of the house and attic was completed at 1:52 p.m. and that Domine observed the gun light at 1:54 p.m.—two minutes later. Id. at 14. The government explains that Delance Hope remained on the scene until 2:00 p.m. Id. The government says that Domine recovered Delance's glasses "at his request," and thus that it was reasonable for Domine to be present in the room where the glasses were located. Id. The government says that Delance's request for his glasses "implied that he consented to officers recovering them, and Officer Domine was entitled to sweep the room from which he retrieved the glasses." Id.

The government contests the defendants' position that once police complete a protective sweep, they must "immediately and without hesitation vacate the premises before the arrested suspect has even been transported away from the premises—even if it means disregarding the suspect's

38

reasonable requests for vital personal possessions or medicines." Id. And it emphasizes Judge Dries's finding that officers may secure a dwelling while seeking a search warrant (citing Segura v. United States, 468 U.S. 796, 810 (1984)). The government maintains that once the officers had concluded the protective sweep—even before Domine had seen the gun light—they had probable cause to obtain a warrant and so were justified in remaining on the scene while awaiting it. Id.

The government emphasizes Judges Dries's finding that Domine's affidavit did not contain any unlawfully obtained information. Id. at 15. It says that, contrary to the defendants' arguments that Dominique Hope made his statements about the attic hatch after the protective sweep was completed, at 1:49 Officer Domine asked Dominique if anyone was in the attic; hope responded that no one as up there, that the attic hatch had been open since he'd been there and that the officers could go up there. Id. (citing Domine's body camera footage at 13:49:28-13:49:40). The government says that the sweep ended minutes later, at 1:52 p.m. Id. at 16. It asserts that the defendants have not developed their argument that, had Domine included in the affidavit Dominique's statement that he had meant to cover the attic hatch with plywood, the judicial officer would not have found probable cause to issue the search warrant. Id. And, the government says, the defendants have cited no authority for their assertion that the officers were required to administer Miranda warnings to Dominique before asking him if there was anyone in the attic or asking about the attic hatch. Id. at 16-17.

39

C.    The Defendants' Reply (Dkt. No. 82)

As to the lawfulness of the protective sweep, the defendants reiterate much of what they argued in their prior briefs but add "a few more salient points." Dkt. No. 82 at 2. First, they maintain (without citation) that "the members of 'the Fugitive Task Force' only speculated that Delance may be armed." Id. at 3. They argue that the officers believed that Delance lived at an address on N. 64th Street (recall that the address where the July 19, 2023 incident occurred, and at which officers found a box for a Glock, was on N. 64th Street), and reiterate that the officers did not have a "specific and articulable basis" for believing that Delance was armed on July 24, 2023 at the N. 54th Street address. Id.

Next, they argue that there is "no evidence that the ballistic shield was used because officers had specific and articulable facts showing that Delance was armed and posed a danger to police, rather than because police routinely used the shield when conducted wanted checks or arrests." Id. The defendants accuse the government of neglecting to include factual support "in the parties' stipulated facts and thus bas[ing] its legal argument on speculation, not evidence." Id.

The defendants again dispute that the four-and-a-half-minute delay in the officers knocking and announcing and Delance's appearance at the door was evidence of nefarious intent (and they ask the court to "recall that the police were not there to investigate any crime"). Id. They assert that even if Delance was "reluctant to get arrested and was dawdling," that was not a factor

40

"putting the police on edge," as Judge Dries found that it was. Id.

The defendants say that although the officers heard movement in the home, the government has not demonstrated what it was about that movement that would cause the officers to believe they might be in danger; they assert that simply hearing movement is not enough to justify a protective sweep. Id.

The defendants refine their argument regarding Delance Hope's statement to officers that there wasn't "nobody" in the house. They assert that when Delance told officers that there was no one in the house, what he meant was that "there is no one else in the house that the police seek." Id. at 3-4. The defendants insist that this was not a "lie," and emphasize that Delance did not try to hide the fact that there were other people inside the house (his brother, to whom he spoke). Id. at 4.

The defendants again maintain that even if the protective sweep was justified, the officers exceeded its scope. They emphasize that in Maryland v. Buie, 494 U.S. 325, 335-36 (1990), the Supreme Court held that a protective sweep may not last any longer than is necessary to "dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 7. The defendants insist that the officers remained in the N. 54th Street address after they had completed the sweep and after they had arrested Delance. Id. at 7-8. And they reiterate that Dominique did not consent to a search. Id. at 8.

The defendants assert that the government has not proven that the decision to seek the warrant was not prompted by unlawfully-obtained

41

evidence, or that the unlawfully-obtained evidence did not affect the judicial officer's decision to issue the warrant. Id. at 9.

The defendants reiterate that the fact that Delance Hope asked to get his glasses does not constitute consent to search. Id. at 9-10.

The defendants get to the heart of the problems in this case in the last page or so of their reply. In a section titled, "The defense objects to the government's evidence outside of the parties' stipulated facts," the defendants state:

> The parties discussed whether a hearing was necessary and reached an agreement to forego a hearing and instead submit stipulated facts for the Court to decide this motion. The parties discussed at length the facts that would be provided to the Court and requested several extensions so that they could reach an agreement upon the facts that would decide the Hope's motion to suppress.

> During the parties' discussions, the government was aware that the defendants would be seeking to suppress evidence based on an unlawfully [sic] entry and search. The government thus was aware that it carried the burden of proving that the officers' entry and search of the residence in question was in accordance with the law.

> The defense did not know and will not guess why the government failed to include the warrants it cited in its response to the defense brief and objections to the Magistrate Judge's Report and Recommendation (without stipulation and in objection by the defense). As the government provided, it was evidence it had at its disposal during the parties' discussions of the factual stipulations. If the government intended to rely on them, it should have discussed it with the defense so that the defense could have an opportunity to respond or reach an agreement.

> The government now complains that the [sic] Dominique and Delance Hope's arguments related to the warrants are "undeveloped and unsupported." Dkt. No. 75 at 16. This is a direct result of the government's inclusion of evidence that was not stipulated by the parties and that the government is raising at the eleventh hour

42

(Officer Rutherford's affidavit is being raised in response to the defendant's [sic] objection to the Report and Recommendation). The evidence the government has continued to raise in the midst of briefing and despite Defense objection has forced the defense to answer to new evidence in its replies—including to evidence it did not initially possess.

The defendants have objected to the government relying on evidence that was not included in the parties['] stipulated facts. The Magistrate Judge relied on the evidence without addressing the defendants' objections to their use. The defense again objects to the Court relying on evidence presented outside of the stipulated facts, including the recently added evidence.

The defense would not have agreed to the submission of either warrant and would have asked for a hearing to resolve the parties['] disputes for several reasons. First, the defense did not have the evidence cited in the warrant affidavit by Officer Domine. The defense would have requested that evidence (which it did once the government and Magistrate Judge relied on it). The defense would also have raised additional motions challenging the allegations included in the warrants (misleading information, mischaracterization of the evidence, and summary statements that are inconsistent with body camera footage).

Accordingly, the defendants respectfully request that the Court not rely on the evidence presented outside of the parties' stipulate [sic] facts.

Id. at 10-11. In a footnote, the defendants also state:

The government provided in its reply that during the discussion related to the stipulated facts "the Government advised counsel that addition to those facts may be appropriate depending on the arguments raised by the defendants." Doc. 75 at 3. When the government made these statements, both defense counsel informed the government that the parties['] arguments must be based on stipulated facts if the parties were to forego a hearing.

Id. at 10 n.1.

## VIII. Analysis

As the court stated, the heart of the problem in this case is the parties' understanding—or lack of understanding—of the nature of stipulated facts,

and their differing understanding of the impact of stipulated facts on a judge's decision. "A stipulation is a contract between to parties to agree that a certain fact is true." United States v. Barnes, 602 F.3d 790, 796 (7th Cir. 2010) (citing Analytical Engineering, Inc. v. Baldwin Filters, Inc., 425 F.3d 443 (7th Cir. 2005)). "Generally, stipulations are not binding on the fact-finder." Id. "A contract between the prosecutor and the defendant cannot bind a third party— the district judge—without his consent as well." Id. "Although stipulations are to be encouraged in order to economize on the costs of litigation, a judge has the power to relieve a party from a stipulation when it is reasonable to do so . . . ." Cates v. Morgan Portable Bldg. Corp., 780 F.2d 683, 690 (7th Cir. 1985). See also, Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 12016 (7th Cir. 1989) ("As with other matters of trial management, the district court has 'broad discretion' to decide whether to hold a party to its stipulations; the district court's decision will be overturned on appeal only where the court has clearly and unmistakably abused its discretion.")

It is understandable that both parties would want to avoid an evidentiary hearing. Evidentiary hearings are time-consuming for the parties (and for the court). Neither side can know with certainty what witnesses will say at evidentiary hearings. Credibility determinations are entirely up to the judge. The parties appear to have attempted to avoid these risks by agreeing on a set of facts.

But that agreement—the list of stipulated facts at Dkt. No. 51—goes only so far. The list of stipulated facts does nothing more than tell Judge Dries (and

44

this court) that the parties will not be contesting or disputing the facts on the list. It does not prohibit either party from presenting to the court any facts other than the facts listed in the stipulation. It did not prohibit Judge Dries or this court from considering any facts to which the parties did not stipulate. A fact that is not stipulated is still a fact. It simply is a *contested*, or *disputed*, fact. The court questions whether the parties could have stipulated or agreed to keep from the court relevant, disputed evidence. The job of a judicial officer deciding a motion to suppress is to "identify all of the relevant historical facts known to the officer at the time of the stop or search" and then "decide whether, under a standard of objective reasonableness, those facts would give rise to a reasonable suspicion justifying a stop or probable cause to search." Ornelas v. United States, 517 U.S. 690, 701 (1996) (Scalia, J., dissenting). The court questions whether it would be ethical for parties to agree to keep from the court relevant evidence, depriving the court of its ability to identify the facts necessary for the court to make an informed decision.

The parties' attempt to avoid an evidentiary hearing has resulted in rampant speculation. The defense accuses Judge Dries of speculating about what officers knew when, or why they did certain things (such as bring a ballistic shield or go to the address at N. 54th Street). But in attempting to cabin the evidence that Judge Dries heard and saw, the parties left gaping holes in the evidence. Due to the lack of evidentiary hearing testimony, both parties speculate about everything from why the officers went to N. 54th Street (the government speculates it was because they saw Ms. Dison's car parked

45

nearby) to why they took a ballistic shield with them (each side has its own theory, neither of which are supported by testimony) to why Delance Hope told police "ain't nobody in there" (the defense speculates that he was trying to tell police that no *wanted* people were in the apartment) to what Dominique Hope meant in saying that the attic hatch had "always" been uncovered, and much more. Perhaps an evidentiary hearing would not have plugged all these gaps, but it would have given the parties the opportunity to flesh out *all* the evidence for Judge Dries.

The defendants assert that they told the government they would forego an evidentiary hearing only if the government agreed to confine its arguments to the stipulated facts. The government doesn't appear to remember the conversation that way. The court was not part of that conversation, and any agreement the parties reached is not memorialized in writing or available to the court. But again, the court is not convinced that any agreement to withhold relevant evidence from the court would have been enforceable (or wise).

The defendants complaint that Judge Dries ignored their objections to him considering facts other than those to which the parties stipulated. But the word "objection" never appears in the defendants' briefs before Judge Dries. To the extent that the defendants expressed concern that the government was arguing facts to which the parties had not stipulated, those expressions of concern are brief and appear at pages six and seven of their reply brief (Dkt. No. 60). The defendants say, "[t]he government argues that officers had reason to believe firearms may be present in the residence because they thought

46

Delance might have the Glock associated with the empty box they found in his home. But not only is it not included in the parties' stipulated facts, it's not included in any discovery the government produced." Dkt. No. 60 at 6. As the court has observed, it is not clear what the defendants mean by "it" was not included in the stipulated facts or discovery, and this sentence is not an "objection" to Judge Dries considering a fact. It is an assertion that the defendants had not agreed to this fact. Similarly, the defendants respond to the government's argument that officers knew Delance Hope to be armed and dangerous because he was characterized that way in the NCIC database by stating that that information was not included in the stipulated facts and "more importantly, counsel received no evidence that the police officers had or knew this information prior to their entry at 2773 N. 54th Street." Id. at 7. Again, this is not an "objection" to Judge Dries considering the fact—it is an alert that the defendants did not agree to the fact.

The defendants complain that they never were "afforded an evidentiary hearing." Dkt. No. 70 at 26. That is, of course, because the defendants did not ask for an evidentiary hearing (as they concede when they explain that in settling on a set of stipulated facts, they were trying to *avoid* an evidentiary hearing). This court's Criminal Local Rule 12(c) states:

> **Evidentiary Hearing.** If a motion seeks an evidentiary hearing, the movant must provide in the motion a short, plain statement of the principal legal issue or issues at stake and specific grounds for relief in the motion and, after a conference with the non-movant, provide a description of the material disputed facts that the movant claims require an evidentiary hearing. The movant also must provide an estimate of the in-court time necessary for the hearing. The non-movant may file a response opposing an evidentiary hearing within

47

3 days after filing of a movant's motion seeking an evidentiary hearing. The non-movant's response must include a short, plain statement of why that party believes that an evidentiary hearing is unnecessary.

The July 3, 2024 motion to suppress did not comply with this rule. The defendants did not ask for an evidentiary hearing and did not supply the description of the issues at stake or the amount of time needed. The court understands that that was by choice; the defendants believed that in agreeing to a set of stipulated facts, they would obviate the need for a hearing. The subsequent litigation demonstrates that that belief was unfounded. In hindsight, one sees that there are numerous relevant, disputed facts. An evidentiary hearing will provide Judge Dries the information he needs to resolve those factual disputes.[5]

Another, related problem is the defendants' assertion that at the time they agreed on the stipulated facts in Dkt. No. 51, they did not have discovery about some of the now-disputed facts. The government drops footnotes stating that it provided certain evidence (the search warrant affidavit, Officer Rutherford's affidavit in support of a search warrant for Delance Hope's cell phone) in May 2024 (before the date on which the defendants filed their motion to suppress). The court has no way of knowing what discovery the government

---

[5] Regarding the governing law, the court is troubled by the defendants' representation in the motion to suppress that the "protective sweep doctrine does not apply where officers have conducted an arrest outside the home." Dkt. No. 54 at 4 (citing United States v. Arch, 7 F.3d 1300, 1303 (7th Cir. 1993)). As Judge Dries explained, the Seventh Circuit case cited by the defendants does not stand for that proposition. Dkt. No. 61 at 9. The court encourages the parties to review carefully the cases they cite in support of their legal arguments.

48

provided when, and the defense hints that it now has more information which it may use to file a <u>Franks</u> motion. Before the date on which Judge Dries schedules the evidentiary hearing on the motion to suppress, the government must ensure that it has turned over to the defense all the evidence it has relating to what officers knew when they went to the North 54th Street address on July 24, 2023.

The court will remand this case to Judge Dries to conduct an evidentiary hearing. Facts that were not presented to Judge Dries have now been introduced; an evidentiary hearing will allow him rule on the expanded record. The parties may, of course, agree on as many facts as they like ahead of that hearing, to avoid having to litigate those facts. But Judge Dries will resolve any disputed facts or issues, including issues of witness credibility. The court will require that before Judge Dries sets a date for the evidentiary hearing, the parties must attempt to file a joint statement identifying the amount of time they believe such a hearing will require and the number of witnesses each side will call. If the parties cannot jointly agree, they may file separate statements regarding the amount of time necessary for the hearing. As for the defendants' request that the court grant them leave to file a <u>Franks</u> motion, the court will deny that request without prejudice. Once Judge Dries has heard evidence on the motion to suppress and issued his decision, the defendants may renew their request, if they think it necessary (understanding, of course, that the decision to accuse a law enforcement officer of making false statements should not be made lightly).

### IX. Conclusion

The court **DECLINES** to accept Judge Dries's Report and Recommendation at this time. Dkt. No. 61.

The court **REMANDS** the motion to suppress (Dkt. No. 54) to Judge Dries for further proceedings consistent with this order.

The court **ORDERS** that by the end of the day on **March 7, 2025**, the parties must file with Judge Dries a joint statement advising him how much time will be needed for the evidentiary hearing and how many witnesses each party estimates calling. If the parties cannot agree on a joint statement, they may file separate statements.

The court **DENIES WITHOUT PREJUDICE** the defendants' request that the court grant them leave to file a <u>Franks</u> motion out of time. Dkt. No. 70.

The court **REMOVES** the hearing scheduled for February 14, 2025 from the court's calendar.

Dated in Milwaukee, Wisconsin this 12th day of February, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

50